IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LINDA R. MATCHINSKE            )
                               )
v.                             )    No. 3:04-1098
                               )    Judge Wiseman/Brown
JO ANNE B. BARNHART, Commissioner )
of Social Security             )

To: The Honorable Thomas A. Wiseman, Jr., Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits (DIB), as provided under Title II of the
Social Security Act, as amended.  The case is currently pending
on plaintiff's motion for judgment reversing and remanding the
matter (Docket Entry No. 28), to which defendant has responded
(Docket Entry No. 31).  Plaintiff has filed a reply (Docket Entry
No. 34) to defendant's response.  For the reasons stated below,
the Magistrate Judge recommends that plaintiff's motion be
**DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

### I.  INTRODUCTION

Plaintiff filed her DIB application on June 19, 2001
(Tr. 57-59).  She alleged disability since October 10, 1999, due

1

to pain associated with multiple sclerosis ("MS") (Tr. 72). Her application was denied at the initial level of administrative review, and again upon reconsideration (Tr. 34-37). Plaintiff thereafter requested a hearing before an Administrative Law Judge ("ALJ"), who heard the case on September 3, 2003 (Tr. 280-310). Plaintiff was represented by counsel at the hearing, and gave testimony along with her husband. Testimony was also received from a vocational expert ("VE").

On June 24, 2004, the ALJ issued a written decision denying plaintiff's claim (Tr. 15-24). The decision contains the following enumerated findings:

1. The claimant met the insured status requirements of the Act as of her alleged disability onset date, October 10, 1999.

2. The claimant has not engaged in substantial gainful activity since October 10, 1999.

3. The claimant has a combination of impairments considered "severe," which includes myofascial pain syndrome, obesity and an adjustment disorder.

4. This combination of impairments does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to perform medium work activity with moderate mental limitations in the ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal

2

workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.

7. The claimant is able to perform her past relevant work as a housecleaner, cashier, receptionist and general office clerk,[1] but past work involving managerial/professional skills must be eliminated.

8. As an alternative finding, the claimant can perform other work that exists in significant numbers in the national economy, therefore, Medical-Vocational Rules 203.29 and 203.22, used as a framework for decision making, indicate that a finding of "not disabled" is appropriate.

9. The claimant has been "not disabled," as defined in the Act, since October 10, 1999.

(Tr. 23-24).

On October 18, 2004, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 5-7), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

---

[1] It appears that the job of receptionist/general office clerk was not past relevant work, but was in fact an unsuccessful work attempt after plaintiff's alleged onset date of disability. Plaintiff worked as a coordinator of children's programs from December 1, 1999 to March 1, 2000; as a receptionist/office clerk from August 1, 2000 to October 1, 2000; and as an interviewer for the Census Bureau from April 1, 2001 to April 15, 2001 (Tr. 73, 303-04). The ALJ found that first two jobs, which plaintiff performed for three months and two months, respectively, were "unsuccessful work attempts" (Tr. 15). These unsuccessful work attempts after plaintiff's alleged onset date are further discussed infra at pp. 27-29.

3

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

#### 1.  Magnetic Resonance Imaging ("MRI")

An October 1999 MRI showed subtle, tiny signal foci that led to no definitive diagnosis (Tr. 16, 133-134).  In March 2001, Dr. Harold Moses, a treating neurologist, viewed the most recent MRI and compared it to an MRI from a year earlier (Tr. 16, 139).  He reported no significant interval change on the MRI to suggest multiple sclerosis.  (Tr. 16, 139).  If anything, Dr. Moses found some improvement (Tr. 16, 139).

#### 2.  Notes of Treating and Examining Sources

Plaintiff checked into a hospital in November 2000 complaining of chest pain (Tr. 16, 135).  All testing returned normal and doctors concluded that plaintiff had no medically determinable cardiac impairment (Tr. 16, 135-137).  Diagnosis included MS (Tr. 136).  The hospital discharged plaintiff to home self care (Tr. 136).  The discharge note indicated that anxiety and stress may have contributed to plaintiff's chest pain as she took care of mentally handicapped children and adopted several children with fetal alcohol syndrome and mental retardation (Tr. 136).

In January 2001, Dr. Moses reported that plaintiff's clinical symptoms as well as neurological examination did not

4

support a MS diagnosis (Tr. 16, 139-140). Dr. Moses reported that plaintiff experienced bad headaches for several years that Dr. Littell treated (Tr. 139). She stated that, more recently, she developed leg problems that waxed and waned (Tr. 139). Motor examination revealed normal strength in her upper and lower extremities, muscular tone and alternating motion rate were normal, and plaintiff exhibited minimal difficulty with tandem walking (Tr. 140).

June 2001 examination and review of symptoms returned essentially normal (Tr. 16, 138). Plaintiff reported her pain improved with medication and that "overall, she was doing reasonably well." (Tr. 16, 138). Dr. Roberto Duran evaluated plaintiff in October 2001 for complaints of pain in the back, head, and lower extremities (Tr. 16, 154-155). Dr. Duran reported that plaintiff's pain was "musculoskeletal, neurogenic with symptom dramatization." (Tr. 16, 154). He reported that plaintiff slept seven hours a night and performed activities of daily living ("ADLs"). (Tr. 16, 154-155). Dr. Duran diagnosed obesity and myofascial pain syndrome or reversed fibromyalgia (Tr. 16, 155). He continued her medications, administered a Lidocaine infusion, and recommended aquatic physical therapy (Tr. 16, 152, 155).

The record indicates that Dr. Michael Littell treated plaintiff from September 1998 through December 2001 (Tr. 157-

5

199).  Dr. Littell's notes primarily discuss medication refills
(Tr. 182-185).  In December 2001, Dr. Littell reported that
plaintiff had no underlying mental disorder that significantly
interfered with functioning (Tr. 17, 158).  In February 2002,
plaintiff reported that she had never been treated for mental
health problems (Tr. 17, 113, 202).

On February 6, 2002, Jeri Lee, Ed.D., a licensed
psychologist, performed a consultative mental status examination
of plaintiff (Tr. 18, 200-203).  Plaintiff drove herself to the
examination and arrived early for the appointment (Tr. 18, 200).
She complained of pain so great that she could not tolerate
working, and she complained of decreased appetite, yet
experienced weight gain (Tr. 18, 200-202).  Plaintiff reported
that she had 20 children, 16 adopted and 4 biological, who ranged
in age from 5 to 30 (Tr. 18, 201).

Assessment of memory functions revealed no significant
deficits in immediate recall (Tr. 18, 201-202).  Dr. Lee assessed
plaintiff as having no significant limitations in the ability to
understand and remember, in social interaction, or in adaption
(Tr. 18, 201-203).  Although Dr. Lee found plaintiff's attention
and concentration skills to be intact, she assessed some
limitation in the ability to sustain concentration and
persistence (Tr. 18, 201-203).  The doctor's impression was that
plaintiff had an adjustment disorder with depressed mood, with a

6

current and past global assessment of functioning ("GAF") of 55, indicating no more than moderate mental limitation (Tr. 18, 203).

In May 2002, Dr. Littell completed a medical questionnaire/residual functional capacity assessment (Tr. 223-226). He reported that plaintiff was able to stand for less than 15 minutes before sitting, lying down, or walking for relief, and able to stand less than a total of one hour a day (Tr. 223). He opined plaintiff was able to sit for less than 30 minutes at a time or a total of less than 30 minutes per day (Tr. 223). He indicated that plaintiff's impairment prevented her from sitting or standing efficiently and that even with a sit/stand option plaintiff could not work an eight hour day, five days a week (Tr. 223). Dr. Littell indicated that plaintiff could not use either hand for repetitive actions (Tr. 223-224). He reported that plaintiff could rarely lift and carry up to 9 pounds (Tr. 224). He limited plaintiff to rarely bending and never squatting, crawling, climbing, or reaching above the shoulder (Tr. 225). Dr. Littell recommended that plaintiff not work around environmental hazards including heights, machinery, extreme temperatures, and exposure to gas, dust and fumes (Tr. 225). He reported that plaintiff alleged her pain was severe and he found her to be credible, noting that her pain would have a severe impact on her ability to work with persistence (Tr. 225). Dr. Littell opined that the combined impact of plaintiff's pain and

7

other conditions prevented her from working (Tr. 226).

Dr. Richard Hubbell of the Anesthesiology Pain Clinic evaluated plaintiff in March 2003 and treated her through August 2003 (Tr. 17, 236-269). Plaintiff reported that she experienced good results from Lidocaine[2] infusions (Tr. 17, 236). Dr. Hubbell's initial examination showed no neurological abnormalities (Tr. 17, 236). Plaintiff's treatment plan included continuing Lidocaine infusions, Prozac, and Percocet (Tr. 17, 236-238). During an April 2003 follow-up examination, plaintiff reported good pain relief (Tr. 17, 239). Dr. Hubbell cut the Percocet dose in half because he was "somewhat disturbed" by the amount that plaintiff had taken during the two weeks prior (Tr. 17, 239). Examination remained unchanged from March 2003 (Tr. 239).

June, July and August examinations revealed that plaintiff responded well to the Lidocaine infusions and that when the pain returned, it had decreased in intensity (Tr. 17, 243-252, 254-255). By August, plaintiff was on an "as needed" basis for Lidocaine infusion (Tr. 17, 252, 254-255).

In June 2003, Dr. Littell completed a second medical source statement of ability to do work activity on behalf of plaintiff (Tr. 228-231). He reported that plaintiff would be

---

[2]Lidocaine has both anesthetic and analgesic properties, and is administered intravenously in its crystalline form to produce local anesthesia. Dorland's Illustrated Medical Dictionary 925 (28th ed. 1994).

8

able to lift less than 10 pounds occasionally and not lift any
weight frequently; stand and walk less than two hours in an
eight-hour workday; and sit for no more than 20-30 minutes with
the ability to alternate sitting and standing (Tr. 228-229). Dr.
Littell opined that plaintiff's ability to push or pull was
limited by pain incurred with repetition (Tr. 229). He limited
plaintiff to balancing frequently and never performing any other
postural activities (Tr. 229). The doctor reported that
plaintiff could occasionally reach in all directions, but her
ability to handle, finger, and feel was unlimited, as were her
abilities to see, hear, and speak (Tr. 230). Dr. Littell limited
plaintiff's exposure to vibration, hazards, and fumes/odors, but
otherwise did not limit plaintiff's environmental exposure (Tr.
231).

On September 9, 2003, Dr. Hubbell wrote a letter
describing plaintiff's impairments and her limitations, based on
his six months of treatment and Lidocaine infusions (Tr. 269-
270). He stated that plaintiff had fibromyalgia that was
confirmed by physical examination and response to treatment (Tr.
269). Dr. Hubbell reported plaintiff's symptoms had a severe
impact on her physical abilities, such as chronic pain that
prevented her from completing tasks (Tr. 269). He stated that
when plaintiff performed normal daily tasks without taking
prolonged breaks, she subsequently experienced incapacitating

9

pain and fatigue (Tr. 269). Dr. Hubble reported that even in the absence of exacerbating activities, plaintiff experienced chronic pain and fatigue that would prohibit work (Tr. 269).

Dr. Hubble reported that in the course of treatment, he was able to observe plaintiff's mental acuity, which he found was diminished by her pain and fatigue (Tr. 269). He stated that plaintiff's short-term memory and her ability to concentrate has been affected and have been amplified by her depression (Tr. 269). Dr. Hubble opined that the impact of plaintiff's symptoms on her physical and mental abilities was so severe that she was incapable of working in a job that requires little or no physical exertion (Tr. 270).

### 3. State Agency Medical Consultants

In September 2001, a state agency medical consultant reported that plaintiff was able to lift and carry 50 pounds occasionally and 25 pounds frequently; sit, stand or walk for six hours in an eight-hour workday; push/pull without limitation; climb, balance, stoop, kneel, crouch, and crawl frequently (Tr. 16, 143-150). The consultant reduced plaintiff's RFC from heavy to medium work activity due to her complaints of pain (Tr. 16, 145).

A February 14, 2002, psychiatric review technique form ("PRTF") and mental RFC assessment indicated that plaintiff was mildly limited in her ability to function socially and to perform

Case 3:04-cv-01098   Document 35   Filed 05/16/06   Page 10 of 32 PageID #: 83

ADLs (Tr. 18, 214). She had moderate limitations in her ability to maintain concentration, persistence, and pace (Tr. 18, 214). Mental RFC assessment indicated that plaintiff's most severe limitations were moderate limitations in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule; and the ability to complete a normal workweek without interruptions (Tr. 218-220). The rest of plaintiff's abilities were rated "not significantly limited." (Tr. 218, 220).

B. <u>Testimonial and Other Evidence</u>

In June 2001, plaintiff filed a claim over the telephone (Tr. 19, 67-70). The Agency interviewer reported that plaintiff had no difficulty breathing, understanding, concentrating, talking, or answering (Tr. 19, 69).

In July 2001, plaintiff reported that on most days she was able to prepare her meals (Tr. 19, 80). In August 2001, plaintiff reported that her abilities depended on the day (Tr. 92-93). She had children and pets who were dependent on her for their care, but that someone cared for them when she was very ill (Tr. 19, 92). She reported that someone else performed almost all of the housework (Tr. 92). Plaintiff reported that she helped sort the clothes by telling her help which pile they belonged in (Tr. 19, 92). When she was very ill, she had someone

11

get her clothes out of her closet for her (Tr. 92). Plaintiff reported that she tried to prepare meals and cooked meals in the oven or slow cooker, four times in a good week (Tr. 92). She noted that her family also ate in restaurants or frozen meals (Tr. 92). She shopped once or twice a month, with assistance, and reported that she would then go to bed (Tr. 19, 92). She reported that on a good day she could drive short distances, if she rested before the trip (Tr. 19, 93).

During a September 2001 consultative examination, plaintiff reported waking up around 5 a.m. and going to bed around 7 p.m. (Tr. 19, 202). She did light housework and cooked at least once a week (Tr. 19, 202). She had no difficulty managing cash or her checkbook (Tr. 19, 202). She was able to drive a car, cook meals, dress, bathe, remember appointments, shop for groceries, do housework, and care for her children (Tr. 19, 201-202).

In October 2001, plaintiff reported that she could not perform her ADLs, although she tried to bathe and dress herself daily (Tr. 19, 100). She described herself as "homebound" due to extreme pain and exhaustion (Tr. 19, 100). In early 2002, plaintiff reported that she watched television, but had no idea what was happening due to poor eyesight (Tr. 19, 117). She reported that when she made beds and loaded the dishwasher, she could do nothing else for the day or possibly the week (Tr. 19,

12

117). Her condition varied on a daily basis (Tr. 117). She cooked up to three times a week, and had an assistant cook who helped (Tr. 19, 116-117). She left her home to attend medical appointments and an occasional play or pageant for her children (Tr. 19, 116).

Plaintiff testified at the September 3, 2003 ALJ hearing (Tr. 280-296). She testified she had a high school education and a few years of college (Tr. 284). Her past relevant work included working as a traveling instructor who taught classes on blood born pathogens and HIV prevention (Tr. 285). She enjoyed the job, but testified that by the time she arrived at the job site, she was in pain and often nauseated (Tr. 286). She testified that she would not have the answers to the students' questions on the tip of her tongue (Tr. 286). Plaintiff also worked as a receptionist for a printing company, but decided that she did not know what she was doing and quit (Tr. 285).

Prior to getting sick, plaintiff testified that her family was her ministry and that she and her husband adopted 13 special needs children (Tr. 289, 292). She also had 4 biological children (Tr. 293). At the time of the hearing, the youngest children were six and seven and had been adopted when they were newborns (Tr. 293). She had children and grandchildren around the house all of the time (Tr. 289). The family worked together

13

and she cared for the children (Tr. 289).  Since getting sick, on a good day, plaintiff can put together sandwiches and heat up soup (Tr. 289).  On a bad day, she cannot do anything (Tr. 289).

Plaintiff testified that she experienced memory problems (Tr. 286-287).  For example, she did not remember her birthday when the pharmacy asked for it to fill a prescription (Tr. 287).  She testified that she could not focus very well (Tr. 291).  Plaintiff was able to write a check, but had someone check it over for her (Tr. 292).  Plaintiff testified that physical pain prevented her from working (Tr. 287).  Her pain was not always in the same place and she felt the pain constantly (Tr. 288).  However, the severity of her pain depended on whether she had Lidocaine infusion and her other medications (Tr. 288).  Plaintiff testified that after the Lidocaine infusion, she slept for the first day and a half (Tr. 288).  Each infusion lasted for two weeks (Tr. 288).

She testified that at home, her children "came to the rescue" to take care of the other siblings and transport her (Tr. 290).  Plaintiff testified that she needed someone to drive her because the pain made her sick to her stomach (Tr. 290).  Her husband did a large part of the housework, but her adult children helped and they hired someone to assist (Tr. 290).  Her husband and children cooked and did the laundry (Tr. 290).  Her husband vacuumed or swept when he had time (Tr. 291).  Plaintiff

14

testified that she could push herself "for a little while" and then she needed to rest (Tr. 291). If she pushed, then rested, off and on for an entire day, the next day she would be bedridden (Tr. 291).

### C. Third Party Testimony

Plaintiff's husband testified at the ALJ hearing (Tr. 296-301). He testified that all of the adopted children were handicapped with fetal alcohol syndrome, some with an additional seizure disorder (Tr. 296). The couple cared for disabled children for the past 20 years (Tr. 297). Part of their care included miniature horses and pony therapy (Tr. 297). Her husband described plaintiff before she got sick as a "human dynamo." (Tr. 298). She multi-tasked such as cooking supper, helping with homework and working on a special project all at the same time (Tr. 298). She kept track of what needed to be done around the house and managed the money, including paying all of the bills and taking care of the bank account (Tr. 298).

Plaintiff could no longer multi-task and often could not complete one task once her symptoms started (Tr. 298). Tasks took significantly longer to complete and when she helped , it did not last very long (Tr. 298). Her legs got sore, she could not hold on to things like she used to, and she forgot what she had already done (Tr. 299). Plaintiff's husband and children did most of the cooking and housework (Tr. 299). He testified that

15

his wife spent most of her time in a recliner chair, by the door, and watched her children with the horses (Tr. 300). They hired help to work with the children and the horses (Tr. 300).

D. <u>VE Testimony</u>

The vocational expert asked plaintiff to clarify some of her past relevant work ("PRW"). (Tr. 301). The VE categorized plaintiff's work in home health nursing from 1988-1999 as medium, semi-skilled (Tr. 301-303). The VE testified that plaintiff's work as the director of Home Safe and Sumner, Wilson, Robertson Kent was sedentary, skilled (Tr. 302, 304). The VE categorized plaintiff's work as public health educator as light, skilled (Tr. 302-303). The VE categorized plaintiff's work from December 1999 through March 2000 creating children's programs as light and skilled (Tr. 303). Plaintiff worked as a census interviewer, a light and semi-skilled job (Tr. 303). Plaintiff's work as a receptionist was categorized as sedentary, unskilled work (Tr. 303-304). Her job as a general office clerk was light and unskilled (Tr. 304). Her work on the assembly line in Flex Technologies in 1994 was described as medium, semi-skilled work (Tr. 304). Plaintiff's work as a manager was categorized as light, skilled (Tr. 305-306).

The ALJ asked the VE whether work existed for an individual with the capabilities listed by Dr. Littell in June 2003 (Tr. 228-231): lifting less than 12 pounds occasionally, not

16

frequently standing, walking less than 2 hours, requiring a sit-stand option with limitations in the use of upper and lower extremities, and not perform postural activities, aside from balancing, and limited in the ability to read occasionally (Tr. 306). The VE testified that such a person needed attendant care to survive daily and could not work on a part-time basis (Tr. 306).

Next, the ALJ asked whether work existed for an individual with the capabilities listed in Dr. Littell's May 2002 questionnaire (Tr. 223-227, 306). The VE responded that the restrictions sounded very similar to those listed in the first hypothetical (Tr. 306-307). Next, the ALJ asked whether a person, as listed in Exhibit 10F (PRTF), having mild restrictions of ADLs due to psychological factors, mild restriction of social function, moderate difficulty in maintaining attention and concentration with no episodes of deterioration or decompensation would be able to perform past skilled or semi-skilled work (Tr. 204-217, 307). The VE responded that such an individual would be able to perform past skilled or semi-skilled work (Tr. 307). Next, the ALJ added the mental RFC limitations of moderate understanding, remembering and carrying out detailed instructions, maintaining attention and concentration for extended periods, performing in activities with any skills, maintaining punctuality, and completing all of the work due in a

17

work-week without interruptions from psychologically based symptoms, and asked whether these limitations would allow performance of past work (Tr. 21-221, 307). The VE testified that the person could perform at least some past work (Tr. 307).

The ALJ asked the VE about Dr. Lee's assessment and whether it suggested a build that would meet the mental demands of past work (Tr. 200-203, 307). The VE testified that the demands of program director would be precluded (Tr. 307). The VE testified that cashiering jobs, manufacturing jobs, house cleaning jobs remained available, but not the professional jobs (Tr. 307-308). The ALJ asked the VE to identify sedentary, semi-skilled and unskilled jobs that a person with a GAF of 55 could perform (Tr. 308). The VE responded that such an individual could perform jobs that have automatic cues, like a telemarketer classified as semi-skilled, with 2,400 jobs statewide (Tr. 308). An individual could also work as an unskilled entry level receptionist (2,932 statewide); as a file clerk, sedentary semi-skilled (1,604 statewide). (Tr. 308-309).

The ALJ asked the VE whether work existed for an individual described in the state agency RFC assessment, with an ability to perform medium work (Tr. 143-150, 309). The VE testified that the individual could perform all of the plaintiff's past jobs (Tr. 309). Last, the ALJ asked the VE whether work existed for an individual with the physical and

mental limitations to which plaintiff testified (Tr. 280-296, 309). The VE testified that no work was available for such an individual (Tr. 309).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Secretary, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Commissioner, 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Commissioner, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273

19

(6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  <u>Hurst v. Secretary</u>, 753 F.2d 517, 519 (6th Cir. 1985).

      B.  <u>Proceedings at the Administrative Level</u>

      The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.

_____

   [3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

Case 3:04-cv-01098   Document 35   Filed 05/16/06   Page 20 of 32 PageID #: 93

(5) Once the claimant establishes a _prima_ _facie_ case of
    disability, it becomes the Commissioner's burden to
    establish the claimant's ability to work by proving the
    existence of a significant number of jobs in the national
    economy which the claimant could perform, given his or her
    age, experience, education, and residual functional
    capacity.

_Moon v. Sullivan_, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the
evaluation process can be carried by relying on the medical-
vocational guidelines, otherwise known as "the grid," but only if
the claimant is not significantly limited by a nonexertional
impairment, and then only when the claimant's characteristics
identically match the characteristics of the applicable grid
rule.  Otherwise, the grid can not be used to direct a
conclusion, but only as a guide to the disability determination.
_Id._  In such cases where the grids do not direct a conclusion as
to the claimant's disability, the Commissioner must rebut the
claimant's _prima_ _facie_ case by coming forward with particularized
proof of the claimant's individual vocational qualifications to
perform specific jobs, which is typically obtained through
vocational expert (VE) testimony.  _See_ _Varley v. Secretary_, 820
F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for
purposes of the analysis required at steps four and five above,
the Commissioner is required to consider the combined effect of
all the claimant's impairments, mental and physical, exertional

21

and nonexertional, severe and nonsevere.  <u>See</u> 42 U.S.C. §
423(d)(2)(B).

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges the following errors in the ALJ's
decision: (1) that he made material factual errors in assessing
plaintiff's credibility, including his statement that plaintiff
was caring for "at least 13 special needs children who live in
her home"; his statement that plaintiff testified to being
disabled by multiple sclerosis (MS); his reference to plaintiff's
"professionally polished nails"; and in his mischaracterization
of plaintiff's hearing testimony; and (2) that he misapplied and
failed to follow the Commissioner's regulations by making his own
medical determination that plaintiff does not have fibromyalgia;
by improperly rejecting the opinions of plaintiff's treating
physicians in favor the consulting physicians' opinions; by
failing to assess the credibility of plaintiff's husband, who
testified at the hearing; and by finding that plaintiff's
unsuccessful work attempts contradict her testimony that she is
unable to engage in any significant activity.  Plaintiff also
alleges that the ALJ misunderstood the meaning of the physician's
notation of "symptom dramatization," construing this finding as
though it were synonymous with malingering and thus inconsistent
with her claims of disabling symptoms.

In concluding her brief, plaintiff states that "[t]he

22

key to understanding this case and why it should be remanded is found in the ALJ's mistaken recollection that Plaintiff was caring for 13 special needs children while at the same time claiming to be disabled. That mistaken recollection explains the ALJ's other errors of fact and of law in this case." (Docket Entry No. 29, p. 14). The undersigned must respectfully disagree with this conclusion. While the ALJ did state at one point in his opinion that plaintiff helped care for the 13 children "who live in her home" (Tr. 20), it is clear from the balance of his opinion that he did not labor under the misconception that plaintiff was raising 13 minor children at any one time after her alleged onset date. More likely, the ALJ intended the above statement to correlate with plaintiff's testimony that her children and grandchildren were "all the time around the house." (Tr. 18, 289). Even if the ALJ did misstate plaintiff's situation at home, it is clear that he did not misunderstand the fact that many of these "children" were adults and no longer in need of plaintiff's care. He noted elsewhere in his opinion that the ages of plaintiff's children ranged from 5 to 30 (Tr. 18), and specifically found that plaintiff's level of activity exceeded her alleged limitations by reference to what was required of her "notwithstanding 'help' from her husband and adult adoptees to successfully provide care for the minor special needs children and to raise ponies [for their therapy]" (Tr.

23

20)(emphasis supplied). Accordingly, the undersigned must conclude that what plaintiff alleges to be a linchpin error is in fact harmless error, if error at all.

Likewise, it does not appear that the ALJ's mistaken belief that plaintiff testified to being disabled by MS[4] was significantly prejudicial to plaintiff, as the lack of objective support for a MS diagnosis was only one of a host of factors cited by the ALJ as undermining plaintiff's credibility (Tr. 20). Nor were the ALJ's references (Tr. 18, 20) to plaintiff's "professionally manicured" nails in error, since the ALJ was merely repeating an observation of the consultative examiner which, though later purported to be untrue according to plaintiff's affidavit testimony (Tr. 274), is in either case a trivial detail which had no particular effect on the decision. The other alleged mischaracterizations of plaintiff's hearing testimony are similarly trivial, in that they do not individually or collectively undermine the substantial evidentiary support for the ALJ's credibility finding, i.e., the significant activities plaintiff has been shown capable of performing and the excellent results she has had with Lidocaine infusions.

As to the alleged errors of law, the ALJ's finding that

---

[4]By the time of plaintiff's hearing, MS had been ruled out as a cause of her symptoms. However, while she did not testify at the hearing to suffering from MS, plaintiff did state that MS was her disabling condition in her Disability Report supporting her DIB application (Tr. 72), which she affirmed as truthful under the penalties of perjury (Tr. 59).

24

a diagnosis of fibromyalgia was not objectively supported is not error, inasmuch as he considered the very same symptoms alleged to result from fibromyalgia as related to the diagnosis of myofascial pain syndrome, which was found to be objectively supported. Plaintiff concedes that the two conditions are so closely related as to be indistinguishable from a symptoms standpoint. (Docket Entry No. 34, p. 2). There is no doubt that the ALJ credited plaintiff's pain syndrome as causing chronic mild to moderate pain and fatigue, and reduced his finding of her RFC accordingly (Tr. 21). Thus, the ALJ's erroneous assumption that depression is a necessary component of fibromyalgia, and his failure to credit the diagnosis of same by Dr. Hubbell, does not require the reversal of his decision.

With respect to the ALJ's rejection of the opinions of Drs. Littell and Hubbell, the undersigned concludes that his stated reasons for doing so are sufficient. The ALJ found Dr. Littell's assessment of plaintiff's physical capacity reflects "devastatingly severe" limitations (Tr. 21), but that such limitations were not supported by the record as a whole, and were specifically contradicted by the standing and sitting abilities demonstrated by plaintiff in her agency paperwork and in her attendance at the hearing (Tr. 22). Moreover, Dr. Littell's highly restrictive findings are inconsistent with the level of daily activity plaintiff is capable of.

25

As to Dr. Hubbell's opinion, expressed in a letter which concluded that plaintiff is incapable of working (Tr. 269-270), the ALJ found that it was essentially an opinion on the ultimate legal issue of disability, which is reserved to the Commissioner. 20 C.F.R. § 404.1527(e). Dr. Hubbell's letter does not contain any discussion of plaintiff's limitations with respect to the individual strength demands of work, but merely states that her severe pain "prevents her from using her body to complete tasks..." (Tr. 269). As the ALJ also noted, it appears that Dr. Hubbell's opinion does not account for his statements in various treatment notes that plaintiff achieved excellent, perhaps even complete relief of her pain for weeks at a time with Lidocaine infusion therapy (Tr. 243-252). Regarding the ALJ's rejection of Dr. Hubbell's assessment of plaintiff's mental limitations (in light of the doctor's specialization in anesthesiology), suffice it to say that the ALJ was clearly justified in rejecting any aspect of that assessment that is inconsistent with the assessments of the consulting and non-examining psychologists of record, such as the observation that plaintiff's short-term memory was "seriously compromised" (Tr. 269) despite the consulting psychologist's observation of no significant memory limitations (Tr. 201-02). In addition, Dr. Hubbell's observation that plaintiff's ability to concentrate is compromised by her depression is not inconsistent with the ALJ's

26

finding of a moderate limitation in maintaining concentration, persistence, and pace (Tr. 18). The undersigned finds no error in the treatment given Dr. Hubbell's opinion.

Plaintiff's allegation that the ALJ failed to assess the credibility of her husband's testimony is simply incorrect. After summarizing Mr. Matchinske's hearing testimony (Tr. 18-19), the ALJ, at the sixth page of his opinion, found that "[t]he allegations by the claimant and her husband that she is 'essentially bedridden' and 'almost an invalid' are so inconsistent with her activities of daily living (as related to Dr. Lee) and so unsupported by the medical evidence and opinions of treating specialists (Duran and Moses), that Mr. and Mrs. Matchinske's credibility is significantly undermined." (Tr. 20).

Plaintiff alleges error in the ALJ's citation of plaintiff's failed work attempts as evidence of "an ability to perform work activity" (Tr. 16, 21). Defendant has not responded to this argument. However, the consideration of these failed work attempts as among the items of evidence showing some physical and mental ability to do work-related activities, rather than as conclusive proof of the ability to work, does not appear to be in error. As noted by the Seventh Circuit in the unpublished decision in <u>Nance v. Sullivan</u>, 1992 WL 28102, at *4 (7th Cir. Feb. 19, 1992), the applicable regulation, 20 C.F.R. § 404.1574(a)(1), "provides that the [Commissioner] will not

27

consider earnings from unsuccessful work attempts as conclusive

proof that the claimant is currently engaged in substantial

gainful activity."  The court further found as follows:

> In the case at bar, the ALJ did not rely upon the
> plaintiff's work experience to show that the plaintiff
> is currently engaged in substantial gainful activity.
> In fact, the ALJ found that the plaintiff has not
> engaged in substantial gainful activity since December
> 30, 1985.  Thus, the plaintiff was not automatically
> excluded from obtaining benefits based solely upon
> unsuccessful work attempts.  Rather, the ALJ considered
> the plaintiff's work efforts as *additional* evidence to
> support his conclusion that the plaintiff has the
> residual functional capacity to perform sedentary to
> light work.  Used in this fashion, evidence of
> unsuccessful work attempts is not conclusive proof of
> the plaintiff's ability to work, but is only one piece
> of evidence to be considered with other evidence to
> determine whether the plaintiff is physically able to
> work. ... Accordingly, the Court holds that the ALJ did
> not err in considering the plaintiff's work attempts as
> an additional, but not sole, reason for concluding that
> the plaintiff is not disabled.

Id. at *4-5.

A contrary finding is not required by the Sixth Circuit

cases cited by plaintiff, Wilcox v. Sullivan, 917 F.2d 272 (6th

Cir. 1990), and Johnson v. Sec'y of Health & Human Svcs., 948

F.2d 989 (6th Cir. 1991).  Wilcox does not purport to address the

evidentiary value of unsuccessful work attempts, but merely finds

that, where the impairment at issue is characterized by periods

of exacerbation and remission, the ability to work during a

period of remission will not defeat a disability claim.  917 F.2d

at 277.  Likewise, the Johnson court found the Commissioner's

regulation dealing with trial work periods to be consistent with

28

the Social Security Act, in that it provides that "work activity during the trial work period may not be used to support a finding that disability ceased during the trial work period but may be used to support a finding that disability ceased thereafter." 948 F.2d at 992. Accordingly, the undersigned finds no error in the ALJ's consideration of plaintiff's unsuccessful work attempts as evidencing some ability to perform work-related activities.

Finally, as to plaintiff's argument that the ALJ misunderstood Dr. Duran's finding of "symptom dramatization" in that he cited it as a factor in his credibility determination, the undersigned finds no reversible error. While plaintiff's point -- that such a finding does not equate with malingering, which is the conscious faking of symptoms for external gain -- is well taken, the ALJ did not find or imply that plaintiff's pain was malingered. To the contrary, the ALJ found that the record supported a mild to moderate level of chronic pain. In discussing plaintiff's credibility, however, he found that "[t]he discrepancies between allegations and objective evidence; work activity after her AOD; reports of symptom dramatization from her treating pain specialist; and a wide range of daily activities, indicate significant exaggeration as to the limiting day-to-day effects of pain and symptoms." (Tr. 20-21). While plaintiff may have been dramatizing her physical symptoms because of a psychological component of her pain syndrome, rather than because

29

she was consciously attempting to appear more limited than she actually was, nevertheless the pain apparently did not keep her from engaging in a rather robust range of daily activities (as reported to Dr. Lee) or endeavoring to work in limited stints. Whether plaintiff's symptoms are dramatized, magnified, or exaggerated, the undersigned cannot find reversible error in the ALJ's citation to Dr. Duran's report among the other items of evidence deemed inconsistent with plaintiff's claim of total disability. Cf. Pierce v. Louisiana Maintenance Serv., Inc., 668 So.2d 1232, 1238 (La. Ct. App. 1996).[5]

Despite an unusual number of factual mistakes in the ALJ's opinion, the substantial evidentiary support for his findings at each step of the sequential evaluation process is unmistakable. Plaintiff's claims of near total incapacitation

---

[5]While Pierce is not a social security case but a worker's compensation case, its analysis of the issue of symptom magnification in the context of a credibility finding (as opposed to the context where such a finding is used to justify giving less weight to another item of medical evidence pertaining to the plaintiff's pain) is instructive:

We are aware that claimant was generally found to be cooperative during his treatment and testing; as we understand "symptom magnification," however, the cause can be psychological or "hysterical" and not necessarily deliberate malingering. To the extent that the trial court questioned the credibility of the appellant, however, we find that there was a reasonable, factual basis for such question--objective medical measurement of subjective and inconsistent responses. The court clearly concluded that the claimant, for whatever reason, magnified his complaints of pain and the extent of his physical limitations. We cannot say that such determination relative to credibility is clearly wrong in the present case. Reviewing the record in its entirety, we find that there was sufficient evidence before the court upon which to base the finding [of no entitlement to benefits].

30

are contrary to her report of significant daily activities to Dr. Lee, Dr. Hubbell's reports of excellent relief of pain with Lidocaine infusion therapy, and the mere fact of her involvement in the care of children of various ages during the time she alleges an inability to work. This substantial evidence supports the ALJ's credibility finding, which is to be accorded "great weight and deference" in light of his opportunity to observe the demeanor of plaintiff and her husband while testifying. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). Accordingly, the undersigned must conclude that the Commissioner's decision should be affirmed.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment reversing and remanding the matter be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further

31

appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 16th day of May, 2006.

  /s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge